# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00663-NYW

KEITH CHARLES HAHN,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This action comes before the court pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 for review of the Commissioner of Social Security's ("Commissioner") final decision denying Plaintiff Keith Charles Hahn's application for Disability Insurance Benefits ("DIB"). Pursuant to the Order of Reference dated August 1, 2017 [#20], this civil action was referred to the Magistrate Judge "for all purposes" pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2(e). The court has carefully considered the Complaint filed March 14, 2017 [#1], Plaintiff's Opening Brief, filed June 26, 2017 [#17], Defendant's Response Brief, filed July 17, 2011 [#18], Plaintiff's Reply Brief, filed July 31, 2017 [#19], the entire case file, the administrative record, and applicable case law. For the following reasons, I respectfully AFFIRM the Commissioner's decision.

On July 12, 2013, Plaintiff Keith Charles Hahn ("Plaintiff" or "Mr. Hahn") filed an application for DIB under Title II of the Act. *See* [#13-5 at 137-138].[1] Plaintiff alleges he became disabled on April 1, 2013, at the age of 44, due to complications stemming from a blood clot. *See, e.g.,* [#13-2 at 13, 36; #13-5 at 137]. His claim was initially denied on March 28, 2014, and he filed a written request for a hearing on May 28, 2014. [#13-4 at 84-86, #13-4 at 94]. On July 27, 2015, Plaintiff and his counsel appeared for a hearing before Administrative Law Judge Kelley Day ("ALJ").

Plaintiff lives in the furnished basement in his parents' home. [#13-2 at 40]. He has a high school education and had most recently, and for approximately seven and a half years, worked at Wal-Mart in overnight maintenance. [#13-2 at 33, 35, 52]. Before that, he had worked temporarily for a plastics company, preceded by fourteen years of work in plastic injection molding. [*Id.* at 35]. In 2008, Plaintiff began taking blood thinning medication for pulmonary embolism, and that testified that his condition "gradually got worse from that point." [*Id.* at 36]. Plaintiff testified that he suffers from pain in his feet, ankles, and hips, and he uses custom shoe inserts to help manage the pain, but that the pain caused by standing and walking is ultimately what caused him to quit his job in overnight maintenance. [*Id.* at 38-39]. Plaintiff also testified to experiencing "unknown problems with both knees over about the last…six months." [#13-2 at 37]. In addition, Plaintiff suffers from diabetes for which he takes medication, and has been diagnosed with an autism-spectrum developmental disorder. [*Id.*]

---

[1] The court uses this designation to refer to the Electronic Court Filing system ("ECF") document number attached to the Administrative Record and the page number of the Administrative Record as it was filed by the Parties. Plaintiff's citations and Defendant's citations similarly refer to the page number of the Administrative Record, or, where applicable, the page number of a brief. *See, e.g.,* [#17 at 4; #18 at 2].

Plaintiff testified that he enjoys playing railroad simulation games on his desktop computer at home, [#13-2 at 47-48], and typically plays no longer than an hour at a time as he either "decide[s] to quit [and]…maybe watch TV," or lie down if he is not feeling well. [*Id.* at 50]. After about an hour, he feels pain in his hips and sometimes his feet. [*Id.*] He testified that lying in bed for two to three hours helps to alleviate some of that pain. [*Id.*] Plaintiff testified that not every day is so bad, and that to attend the administrative hearing he had ridden in a car for forty-five minutes without problem. [*Id.* at 51]. His parents are the only people he sees regularly, and he sees "a couple of friends a couple of times a year at…various train shows in and around the Denver, Longmont area." [*Id.* at 52-53]. When asked if he would go to the shows more often if they were held frequently, he testified that he would not because he "probably couldn't afford the gas after a while driving to and from." [*Id.* at 53]. Plaintiff testified that he has no problem interacting with the people at the train shows as they share a common interest with him, but that otherwise he does not "socialize very well." [*Id.* at 53-54]. In addition, he testified that he could potentially tour the exhibits at a train show on foot for a full day, "but by the end of the day [he would] be in so much pain, it would take two or three days to…recover." [*Id.* at 58]. Nonetheless, he tries to attend for a full day, and if he starts suffering pain he excuses himself from the group and returns home. [*Id.*] He drives himself. [*Id.*]

Plaintiff has always been single and has no children. [#13-2 at 54]. He has a sister who has three daughters, whom Plaintiff sees a couple of times a month. [*Id.*] He does not babysit or care for them, however, and he testified that he does not currently provide care for his parents, but that "it's getting pretty close to where I may have…to try to start doing some extra stuff." [*Id.* at 55]. Plaintiff testified that he goes to bed late and wakes late, and he occasionally has

difficulty sleeping due to his pain. [*Id.* at 59]. He uses the microwave to prepare food for himself, or he joins his parents for a meal in the early afternoon. [*Id.*]

Finally, Plaintiff testified as to the presence of open ulcers on his feet and the pain they cause. [#13-2 at 60]. He stated that when working at Wal-Mart, by the end of the night he could hardly walk. [*Id.*] He continued with the work because he needed the money, and he testified that he would have continued working if he could have. [*Id.*] In response to the ALJ's questions, Plaintiff testified that he believed he could sit for an hour before his hips and feet started hurting, and that after lying down for a few hours, he could sit upright for two to three hours during an eight-hour day. [*Id.* at 61]. He testified that his pain, when it occurs, is so intense that it requires all of his focus to ease himself through it. At the time of the hearing, Plaintiff walked with a cane and had no open sores on his feet, but he believed such sores would develop if he were required to walk regularly. [*Id.* at 64]. He testified that when he quit his job at Wal-Mart, he was experiencing pain at a level of eight or nine on a scale of one to ten, and that six months or more passed before the pain decreased to a manageable level. [*Id.*]

Ashley Bryers testified as a vocational expert ("VE"). The ALJ queried her whether work exists for a person with Plaintiff's education, background, and work history, who is limited to sedentary work, who cannot climb ropes, ladders, or scaffolds, who can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and be exposed to excessive cold, wetness, and humidity. [#13-2 at 67-68]. The VE testified that such a person could work as an address clerk, for which there are 20,000 jobs in the national economy, as a call-out operator, for which there are 13,000 jobs in the national economy, or as a microfilm document preparer, for which there are 45,000 jobs in the national economy. [*Id.* at 68]. The VE testified that if the hypothetical person were limited to only occasional contact with the public and with

coworkers and supervisors, that person could still work as an address clerk or microfilm document preparer.  [*Id.* at 69].  Such person could likewise still perform the work if he used a cane, and if he needed to change positions from sitting to standing every hour, so long as he remained on task.  [*Id.* at 69-70].  Such person would not be competitive if changing positions required him to be off task more than six minutes every hour.  [*Id.* at 70].

The ALJ denied Mr. Hahn's application in a written decision issued November 24, 2015, concluding that he was not disabled.  [#13-2 at 13-22].  Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on January 10, 2017.  [#13-2 at 2].  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on March 14, 2017.  The court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue*, 500 F.3d 1074, 1075 (10th Cir. 2007).  The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted).  Moreover, the court "may neither reweigh the evidence nor substitute

[its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted). However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### I.     The ALJ's Decision

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least twelve

consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002). Additionally, the claimant must prove he was disabled prior to his date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. § 404.1520(e). If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v.*

*Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")). "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> …
>
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52. The Commissioner may rely upon the testimony of a vocational expert to satisfy her burden at step five, so long as the question posed to the vocational expert

accurately portrays Plaintiff's limitations as supported by the record. *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000); *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992).

The ALJ first determined that Mr. Hahn was insured for disability through December 31, 2017. Next, following the five-step evaluation process, the ALJ concluded that Mr. Hahn: (1) had not engaged in substantial gainful activity since the alleged onset date of April 1, 2013; (2) had severe impairments of "diabetes mellitus with neuropathy, joint disease, chronic stasis dermatitis, pervasive development disorder and attention deficit hyperactivity disorder"; and (3) did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). At step four, the ALJ found that Plaintiff had residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except Mr. Hahn should not climb ropes, ladders, or scaffolds, and should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, or be exposed to excessive cold, wetness, or humidity. [#13-2 at 17]. Additionally, the ALJ found that Plaintiff can sit consecutively for one hour before requiring five to ten minutes to change positions, during which he was capable of staying on task, and that Plaintiff "is limited to simple and routine work that requires occasional interaction with the public, co-workers, and supervisors." [*Id.*]

Mr. Hahn asserts three arguments in objection to the ALJ's decision. First, Plaintiff contends that the ALJ improperly found that he does not meet the requirements of Listing 12.10. Second, Plaintiff argues that the RFC as formulated by the ALJ is not supported by substantial evidence in the record. Finally, Plaintiff asserts that the ALJ improperly assessed his credibility.

## II.      ALJ's Findings at Step Three and Step Four

### A.  ALJ's Assessment of Medical Opinions With Respect to Listing 12.10

Plaintiff asserts that the ALJ erred in her assessment of the consultative psychological examination authored by Stuart L. Kutz, M.D., arranged for by the agency, and the medical opinion of his treating physician, Paul L. Cooper, M.D., which caused her to conclude that Plaintiff's impairments did not meet or equal Listing 12.10, which addresses Autism spectrum disorders.  [#17 at 8-9].  Defendant argues that the ALJ adequately explained the basis for her conclusions, including citing to Plaintiff's testimony, the medical evidence of record, and Dr. Kutz's examination findings and conclusions, and did not err in her assessment of the medical opinions.  [#18 at 8].[2]

> Listing 12.10 characterizes Autism spectrum disorders:
>
> by qualitative deficits in the development of reciprocal social interaction, verbal and nonverbal communication skills, and symbolic or imaginative activity; restricted repetitive and stereotyped patterns of behavior, interests, and activities; and stagnation of development or loss of acquired skills early in life. Symptoms and signs may include, but are not limited to, abnormalities and unevenness in the development of cognitive skills; unusual responses to sensory stimuli; and behavioral difficulties, including hyperactivity, short attention span, impulsivity, aggressiveness, or self-injurious actions.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.10.  The ALJ wrote that Plaintiff's mental impairments did not singly or in combination meet Listing 12.10 because they did not satisfy the "paragraph B" criteria, which require the presence of two or more of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked

---

[2] Defendant also argues that Plaintiff's developmental disorder is not of listing-level severity because it manifested in his youth and Plaintiff nonetheless finished high school and secured gainful employment thereafter.  [#18 at 7].  However, Defendant acknowledges that the ALJ did not raise this basis in her opinion, *see id.*, and the court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue,* 482 F.3d 1205, 1207–08 (10th Cir. 2007).

difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

I consider first the evidence the ALJ considered in forming her conclusion. Relying on a March 5, 2014 "Function Report – Adult" and Dr. Kutz's examination dated October 21, 2015, the ALJ found that Plaintiff had only mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no demonstrated episodes of decompensation. [#13-2 at 16-17]. For instance, on the Function Report, Plaintiff reported no problems attending to his personal care; and he participates in daily chores, such as laundry and clearing snow with a snow-blower, he runs errands with his parents, he drives and is able to go out alone, and he prepares simple meals for himself. *See* [#13-6 at 195-198]. Plaintiff reported that he plays computer games, watches television, and engages in hobbies involving railroad photography and simulation; and he spends time with others through "monthly railroad club meetings, online games, [and] talking with a couple of friends on the phone." [*Id.* at 199]. At the hearing, Plaintiff testified that he does not have problems interacting with others, but prefers to spend time alone. When asked about his schooling, Plaintiff testified that he had not been enrolled in "any type of resource classes" while in high school, and, with respect to job performance, that he "tended to catch on fairly quick with what needed to be done." [#13-2 at 52]. During the mental status examination administered by Dr. Kutz, Plaintiff could spell "house" and "stretch," perform simple addition and multiplication, and rapidly and accurately serially subtract seven from 100. [#13-10 at 621]. I find that the ALJ's conclusions are supported by substantial evidence in the record.

With respect to the weight the ALJ attributed to the medical opinions, Plaintiff argues that the ALJ should have wholly adopted Dr. Kutz's opinions because he is a specialist in the

area on which he opined, no treating or examining physician provided contradictory opinions, and Dr. Kutz's opinions are "consistent with medical evidence showing a pervasive history of Asperger's syndrome and attention deficit hyperactivity disorder." *See* [#17 at 9]. In determining disability for the purposes of DIB, the ALJ considers the medical opinions in the case record together with the rest of the relevant evidence. 20 C.F.R. § 404.1527(b). The ALJ must evaluate every medical opinion in the record, but generally will give more weight to the opinions of a physician who has examined the claimant and to the physician who has treated the claimant. *Id.* at § 404.1527(c). *See Pacheco v. Colvin*, 83 F. Supp. 3d 1157, 1161 (D. Colo. 2015). If the ALJ declines to give the treating or examining source's opinion controlling weight, she will consider the following factors in determining what weight is appropriate:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) (citing 20 C.F.R. § 416.927(c)(2)(i)-(ii), (c)(3)-(c)(6)). *See also* 20 C.F.R. § 404.1527(c). An ALJ is not required, however, "to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). In all cases, an ALJ must "give good reasons in [the] notice of determination or decision" for the weight assigned to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). *See also Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citing Social Security Ruling 96–2p, 1996 WL 374188, at *5; *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir. 2003)).

Dr. Kutz opined that Plaintiff experiences marked difficulty in social functioning, and found that Plaintiff is socially awkward, presents in a manner consistent with a pervasive development disorder, and has difficulty with social cues. The ALJ afforded some weight to this opinion, concluding that Plaintiff's "limitations in this area of functioning are more of a moderate level." [#13-2 at 16]. In so finding, she considered the record evidence identified above, i.e., that Plaintiff reported speaking occasionally with friends on the telephone and spending time with others at monthly railroad club meetings. [*Id.*] Indeed, Dr. Kutz's report reflects that Plaintiff "has some contact with friends." [#13-10 at 620]. And, while Dr. Kutz noted that Plaintiff has marked difficulty interacting with the public and with coworkers and supervisors, [#13-10 at 616], Plaintiff testified that he got along fine with both coworkers and supervisors, with one isolated exception. *See* [#13-2 at 49, 65]. Plaintiff does not cite the court to the record in support of his assertion that Dr. Kutz's opinion "is consistent with medical evidence showing a pervasive history of Asperger's syndrome and attention deficit hyperactivity disorder." [#17 at 9]. In any event, the ALJ acknowledged what she considered to be Plaintiff's "moderate" limitations in this area of functioning by limiting him to only occasional interaction with the public, his coworkers, and his supervisors.

The ALJ similarly found that Plaintiff displayed moderate difficulties with respect to concentration, persistence, and pace. In so finding, the ALJ considered the fact that Plaintiff spelled "house" and "stretch," and was able to add and multiple and serially subtract; his "simple verbal abstraction was at least fair and more complex verbal abstraction through proverbs was fair to good"; he had obtained a full-scale IQ score of 103; and his "perceptual reasoning and nonverbal skills were relative strength and in the high average [sic], although his processing speed was in the low average." [#13-2 at 20]. She noted that Dr. Kutz opined that Plaintiff's

attention and concentration "seemed moderately to markedly impaired," but found that Dr. Kutz had provided "no reason for this opinion, which seem[ed] inconsistent with examination findings," and noted in particular that Plaintiff's "cognitive functions were quite adequate and he functioned overall within the average range." [#13-2 at 16-17, 20].[3] Similarly, although Dr. Kutz opined that Plaintiff's social adaptation was more markedly impaired," the ALJ found that the record reflected no impairment in Plaintiff's understanding and memory. [*Id.* at 20]. Indeed, Dr. Kutz reported that Plaintiff had no difficulty understanding and remembering complex instructions, had mild difficulty carrying out simple instructions, had mild to moderate difficulty carrying out complex instructions and making judgments on simple work-related decisions, and had moderate difficulty making judgments on complex work-related decisions. [#13-10 at 615]. Dr. Kutz did not find that Plaintiff had "marked" difficulty in any of these functions. *See id.* And, the ALJ noted that while Dr. Kutz found limitations in Plaintiff's social functioning, he did not opine that Plaintiff was incapable of performing a job that was simple and routine. [#13-2 at 20]. Finally, the court notes Plaintiff's testimony before the ALJ: "Q: Do you feel like you've had difficulty through the years at your jobs? You know, catching on, understanding what you're supposed to be doing? A: Not really. I tended, I was one of those that tended to catch on fairly quick with what needed to be done." [#13-2 at 52]. Plaintiff also testified that he moved into a leadership position when he worked at the plastics injection molding business. [*Id.* at 65]. While the ALJ did not fully adopt Dr. Kutz's report, she restricted Plaintiff, based on Dr. Kutz's opinions, to simple and routine work. [*Id.*]

Plaintiff argues that Dr. Cooper supported Dr. Kutz's opinion by referring to Mr. Hahn as a "[p]oor candidate for [ . . . ] nonphysical jobs" and noting that Mr. Hahn "reacts very poorly to

---

[3] The form defined moderate as "more than a slight limitation in this area but the individual is still able to function satisfactorily." [#13-10 at 615].

stress and new environments." [#17 at 9]. The ALJ acknowledged that Dr. Cooper was Plaintiff's primary care physician and considered the Residual Functional Capacity Form that he had signed, [#13-2 at 18, 20], but found that the "record showed no treatment" for Plaintiff's professed difficulty in social interactions, or that Dr. Cooper had ever referred Plaintiff to a mental health provider for treatment. [*Id.* at 20]. She observed that Dr. Cooper's "limitations and opinions suggested the claimant was disabled," but found that the treatment records did not support Dr. Cooper's opinions, and that Plaintiff had a good work history and "was able to follow and interact at the hearing adequately." [*Id.* at 21]. The ALJ also noted "it appears that Dr. Cooper relied too heavily on the claimant's subjective complaints." [*Id.* at 21]. The ALJ thus afforded limited weight to Dr. Cooper's opinions, and only to the extent they were consistent with the record evidence.

An ALJ may give less weight to a medical source opinion that is inconsistent with other evidence of record or is not otherwise supported by objective medical findings, including those from diagnostic techniques and testing. 20 C.F.R. § 404.1527(c)(3)-(4). Indeed, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Watkins*, 350 F.3d at 1300 (citing Social Security Ruling 96–2p, 1996 WL 374188, at *2 (Jul. 2, 1996); 20 C.F.R. § 404.1527(d)(2)). I find that the record evidence supports the ALJ's findings and that she adequately explained her reasoning when she disagreed with the medical opinions. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2011) (affirming district court's decision on basis that the order "found that the ALJ articulated adequate reasons for disregarding [treating physician's] opinion"). *Cf. Watkins*, 350 F.3d at 1301 (advising a treating source opinion may not be rejected

absent good cause for specific, legitimate reasons clearly articulated in the hearing decision). Plaintiff does not challenge the ALJ's findings with respect to the degree to which his activities of daily living are restricted or that he had experienced no episodes of decompensation. Accordingly, I agree with the ALJ that Plaintiff's impairments do not meet the criteria set forth in paragraph B.

### B.    The ALJ's Assessment of Plaintiff's RFC and Credibility

Mr. Hahn argues next that the ALJ erred in giving less than controlling weight to Dr. Cooper's medical opinion regarding Plaintiff's physical impairments. [#17 at 11]. Specifically, Plaintiff asserts that Dr. Cooper had been his treating physician for more than three years in July 2015, when Dr. Cooper provided his medical opinion, and argues that the opinion is consistent with the medical evidence in the record, including Dr. Cooper's treatment notes regarding Plaintiff's diabetes, neuropathy, leg pain, and sores on his legs. [*Id.* at 12]. Plaintiff also argues that the ALJ erred in her assessment of his credibility; specifically, he contends the ALJ did not describe what evidence she relied on in making her determination, and did not consider all the evidence of record. [*Id.* at 15-16]. Because the arguments are intertwined, I address them together in this section.

The ALJ first acknowledged that Mr. Hahn suffers from diabetes with neuropathy, ulcers and open sores on the left foot and ankle, and a permanently damaged vein in his left leg, and, "unless he [has] another problem," sees Dr. Cooper once a month "to make sure the blood thinners [are] working properly." [#13-2 at 18]. The ALJ also accepted that Plaintiff suffers from bilateral knee pain from an unknown cause. The ALJ then considered Plaintiff's testimony, as follows. He has difficulty standing and walking around and would have difficulty with a sit-down job due to hip pain and problems with his legs and feet, and that the pain caused by a sit-

down job would likely affect his ability to concentrate. [*Id.*] He has problems climbing stairs and carrying weight, such as laundry, up the stairs. He uses handrails or a cane to keep his balance while walking and climbing. The cane is not prescribed, however, and Plaintiff can navigate around his house without it. Plaintiff drives to doctor appointments and to run errands with his parents, but driving can exacerbate the pain in his knees. He takes Vicodin occasionally and as needed for pain. Plaintiff plays simulated railroad games often and quits after about an hour due to pain in his feet and hips. Once in pain, he lies down for two to three hours to alleviate the pain. Plaintiff does not socialize regularly with anyone other than his parents, although he attends railroad club meetings twice a month. [#13-2 at 18]. The ALJ noted that upon questioning by his attorney, Plaintiff testified that he uses a snow blower when necessary to help clear snow for his parents; he has trouble sleeping once or twice a week due to pain; and he can sit for two or three hours in an eight-hour period. [*Id.*] However, Plaintiff also testified that walking around helps to ease the pain. The pain interferes with his ability to focus on tasks, and he stated that his pain fluctuates from a two to a ten on a scale of one to ten. [*Id.* at 19].

The ALJ determined that Mr. Hahn's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. [#13-2 at 19]. First, the ALJ acknowledged the medical records regarding Plaintiff's chronic ulcerations, the use of a cast boot, and his physician's concern about peripheral arterial disease. [*Id.*] She noted that a study indicated that Plaintiff's blood flow was likely adequate for healing. The ALJ considered that x-ray and MRI images showed findings consistent with osteoarthritis of the mid-foot with moderate degenerative disease of the great toe, and that Plaintiff required the use of customized shoe inserts. Of significance to her, by July 25, 2013,

Plaintiff's use of compression stockings had helped his foot ulcers stay dry and healed, and, by October 2013, he showed only trace edema in his lower extremities. [*Id.* at 19]. Also noteworthy to the ALJ, nothing in the record indicates that Plaintiff cannot perform a job that requires him to sit. [*Id.*] Although records from Dr. Cooper indicate chronic knee and leg pain due to osteoarthritis, and despite Plaintiff's testimony that sitting would cause pain in his knees and hips, the record demonstrates that Plaintiff has received no treatment for these ailments, other than a one-time steroid injection to his knees. Additionally, the ALJ noted, Plaintiff takes Vicodin only sparingly, even though his pain fluctuated to a ten at times. The ALJ also noted that the medical evidence reflected no mention of or treatment for hip pain. [*Id.*] The ALJ also found no evidence in the record, either through Plaintiff's representations to his physicians or Plaintiff's description of his day-to-day activity, that Plaintiff was prone to taking long naps to deal with the pain generated from sitting for an hour at a time. [*Id.* ("The record failed to document any complaints from the claimant to Dr. Cooper…about needing to take such long naps")].

With respect to Plaintiff's diabetes, the ALJ noted that Plaintiff was not on a special diet or exercise regimen; and that while Plaintiff had testified to his belief that diabetes prevented his ulcers from healing as they should, his medical records from January 2014 showed no ulcers or lower extremity edema. [#13-2 at 20]. For these reasons, the ALJ determined that Plaintiff's diabetes created no greater limitation for Plaintiff than what she had already found to exist, but noted that she would restrict Plaintiff from exposure to certain hazards such as "environmental extremes and constant postural maneuvers." [*Id.*]

1. Dr. Cooper's Opinion

The law identified above with respect to the ALJ's treatment of the medical opinions concerning Plaintiff's mental impairments applies here as well, and I respectfully disagree that the ALJ erred in her treatment of Dr. Cooper's opinion limiting Plaintiff's ability to engage in physical activities. The ALJ afforded Dr. Cooper's opinion limited weight and explained her reasoning for diverging from the limitations Dr. Cooper assigned. I find that her reasoning, as stated above, is supported by the record.

Plaintiff also argues that the governing regulations required the ALJ to seek an explanation from Dr. Cooper regarding any inconsistency she perceived between his opinion and the medical evidence. [#17 at 11]. Plaintiff cites to section 416.912(e), which, when in effect, required an ALJ to contact a treating physician if the information the doctor provided was "inadequate ... to determine whether you [the claimant] are disabled." 20 C.F.R. § 416.912(e). However, this section was amended in February 2012, over three years before the administrative hearing at issue here, and thus not in effect at the relevant time. *See* 77 Fed. Reg. 10651-01, 2011 WL 7404303 (final rules, effective March 26, 2012) (removing paragraph (e)). *See also Stewart v. Colvin*, No. 14–1027–EFM, 2014 WL 5410240, at * (D. Kan. Oct. 22, 2014) (recognizing amendment). The regulation governing the ALJ's decision here advises that "[i]f the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency." 20 C.F.R. § 404.1520b(c). This regulation provides the ALJ with greater flexibility and discretion in deciding whether to contact a treating source. Furthermore, as the Tenth Circuit explained in its consideration of 20 C.F.R. § 416.912(e), "it is not the rejection of

the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the 'evidence' the ALJ 'receive[s] from [the claimant's] treating physician' that triggers the duty." *White*, 287 F.3d at 908. There is no indication that the ALJ found the information she received from Dr. Cooper to be incomplete; instead, she concluded that the limitations Dr. Cooper imposed were not supported by the record evidence. As discussed above, that decision is well-articulated and supported, and thus it is not for this court to reweigh the evidence the ALJ considered. *Cf. id.* (disagreeing with plaintiff's argument that ALJ was required to recontact treating physician simply because he disagreed with the conclusion the physician reached).

## 2. Credibility

Finally, Mr. Hahn takes issue with the ALJ's assessment of his credibility. To begin, credibility determinations "are peculiarly the province of the finder of fact," and will not be disrupted if supported by substantial evidence. *Kepler v. Chater,* 68 F.3d 387, 390–91 (10th Cir. 1995). In *Kepler*, the Tenth Circuit identified multiple factors an ALJ could consider in evaluating subjective allegations of pain: "1) whether the objective medical evidence establishes a pain-producing impairment; 2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and 3) if so, whether considering all the evidence, claimant's pain is in fact disabling." *Id.* at 390. The ALJ may consider additional factors as well:

> [1] the levels of medication and their effectiveness, [2] the extensiveness of the attempts (medical or nonmedical) to obtain relief, [3] the frequency of medical contacts, [4] the nature of daily activities, [5] subjective measures of credibility that are peculiarly within the judgment of the ALJ, [6] the motivation of and relationship between the claimant and other witnesses, and [7] the consistency or compatibility of nonmedical testimony with objective evidence.

*Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (numbers added)). The Tenth Circuit has advised that "*Kepler* does not require a formalistic factor-by-factor recitation of the evidence," and, "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *White*, 287 F.3d at 909 (quoting *Qualls*, 206 F.3d at 1372).

As discussed above, the ALJ set forth specific reasons for discrediting in part Plaintiff's complaints of disabling knee and hip pain. For instance, Plaintiff sees one doctor, Dr. Cooper, once a month to ensure blood thinners are working properly. He once received a steroid shot for knee pain. He uses pain medication sparingly, and for this the court commends Plaintiff, but notes as the ALJ did that the record does not reflect other, non-narcotic attempts at pain management.[4] Indeed, there is no record of Plaintiff complaining about pain in his hips. *See* [#13-2 at 19]. Likewise, there was no corroborating documentary evidence that Plaintiff required a two- to three-hour nap to alleviate pain caused by sitting for an hour. The ALJ did not discount Plaintiff's allegations entirely, rather she found "the lack of evidence cast some doubt on the claimant's allegations," and she restricted him to jobs where after an hour of sitting he may "get up and change positions for 5 to 10 minutes while staying on tasks." [*Id.* at 17]. Thus, I disagree with Plaintiff that the ALJ's conclusion is limited to boilerplate language, or that she

---

[4] In his Opening Brief, Plaintiff asserts that he "has used several different pain medications over time, and all have failed to provide relief," "[h]is nonmedical strategies for pain relief, such as wearing diabetic shoes, have been similarly ineffective," and he "has engaged in consistent efforts to relieve his pain over the years without success." [#17 at 17]. Plaintiff does not cite the court to record evidence to support these contentions, and the court found none during an independent search. The court also notes Plaintiff's testimony during the hearing: "Q: And has Dr. Cooper wanted to refer you to any kind of pain management doctor or anything like that? A: No, no." [#13-2 at 37]. *Cf. Qualls*, 206 F.3d at 1372 ("The ALJ here did not purport to deny plaintiff benefits on the ground he failed to follow prescribed treatment. Rather, the ALJ properly considered what attempts plaintiff made to relieve his pain—including whether he took pain medication—in an effort to evaluate the veracity of plaintiff's contention that his pain was so severe as to be disabling.").

failed to "explain which evidence she relied on to make her credibility determination." [#17 at 15]. *Cf. Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) ("it is not enough for the ALJ simply to list the relevant factors; he must also 'explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible.'") (citation omitted).

Additionally, to the extent Plaintiff argues the ALJ "failed to consider all evidence in the case record," such as medical evidence that "thoroughly documents Mr. Hahn's severe complications from diabetes, including diabetic neuropathy and frequent sores on his legs and feet," Plaintiff fails to cite the court to that evidence, or explain the association between the pain associated with his diabetes, i.e., chronic ulcerations of his lower extremities, with the pain in his knees and hips. *Id.* at 16. Indeed, when questioned by the ALJ if he felt that his diabetes affected his "ability to do day to day activities," Plaintiff testified as follows: "I think it has something…to do with it, yes…when injuries, especially to the feet…ankle area flare up in some fashion, I believe that the diabetes actually prevents it from healing as fast as it could or should." [#13-2 at 38]. But there is no explanation as to why pain caused by ulcers in his feet and ankles would prevent Plaintiff from sitting for hour-long periods of time. And, to the extent an association exists between the chronic ulcerations and the knee and hip pain, the ALJ noted that the record showed that as of July 2013 compression stockings had helped Plaintiff manage the ulcers and he had only trace edema in the lower extremities, and that by January 2014, he had no ulcers or recent lower extremity edema. [#13-2 at 19, 20]. Plaintiff also argues the ALJ failed to address Dr. Cooper's opinions that the complications from his diabetes, i.e., diabetic neuropathy and frequent sores on his legs and feet, cause his pain, and that the pain is the reason he cannot tolerate an eight-hour work day. [#17 at 16]. However, the ALJ determined that Dr. Cooper

"relied too heavily on the claimant's subjective complaints."  [#13-2 at 21].  And, as discussed in this section, I find that this was not in error.

## CONCLUSION

Plaintiff has shown no error in the ALJ's decision justifying remand, accordingly, the court hereby AFFIRMS the Commissioner's decision.

DATED: February 26, 2018                              BY THE COURT:


                                                     s/ Nina Y. Wang_____
                                                     Nina Y. Wang
                                                     United States Magistrate Judge